REVISED, October 29,1999

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-30411

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CAPTAN JACK WYLY; DOROTHY MORGEL;
EAST CARROLL CORRECTIONAL SYSTEMS, INC.,

Defendants-Appellants.

_____

No. 98-30434

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EAST CARROLL CORRECTIONAL SYSTEMS, INC.,

Defendant-Appellant.

_____

No. 98-30865

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DALE RINICKER; ET AL.,

Defendants,

CAPTAN JACK WYLY, JR.; KENNETH KNIGHT
KILLEN, JR., on behalf of William Bryant
Killen; JAMES PAUL BROWN, on behalf of
Matthew P. Brown, on behalf of Kathrine J. Brown;

_____

**Appeals from the United States District Court
for the Western District of Louisiana**

_____

October 13, 1999

Before KING, Chief Judge, and SMITH and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Primarily at issue in these consolidated appeals from criminal convictions for mail fraud, conspiracy, money laundering, and forfeiture is whether the Government's rebuttal closing argument deprived Captan Jack Wyly, Dorothy Morgel, and East Carroll Correctional Systems, Inc. (ECCS), of a fair trial. They contest their convictions and the forfeiture order; in addition, ECCS contests its $4.8 million fine. And, various ECCS shareholders contest not being permitted to assert a claim to ECCS' forfeited assets. We **AFFIRM** all but the forfeiture of Morgel's seized checking account funds and the ECCS fine.

I.

In 1990, Dale Rinicker, then Sheriff of East Carroll Parish, Louisiana, asked Wyly, then a 72-year-old Lake Providence attorney, to finance the construction of a private prison in the parish to house state prisoners. Under state law, such facilities must be sponsored by a governmental entity. Because public funding was not available, an investor was needed.

- 2 -

Wyly agreed to construct a prison and lease it to the Sheriff's Office. Rinicker testified that Wyly offered him 38% (later reduced to 30%) of the profits of the corporation (ECCS) that Wyly planned to form for purchasing and constructing the facility. Wyly, however, testified that, *after construction was well underway*, Rinicker threatened to withdraw his prison sponsorship unless he received a 38% share; and that he ultimately agreed to give Rinicker 30%.

In April 1990, Wyly formed ECCS as a subchapter S corporation; he was president and Morgel, his then 62-year-old legal secretary (she had worked for Wyly for 35 years), was secretary-treasurer. Thirty-five of the 100 ECCS shares were issued in Morgel's name (representing 5 for her *and 30 for Rinicker*); the remainder, to Wyly, members of his family, and Jack Hamilton, who owned land near the facility and, post-indictment, became ECCS' president.

Soon after its incorporation, ECCS purchased an abandoned school building and began renovating it — the East Carroll Detention Center (ECDC). Financing was through another of Wyly's corporations, Desona Dairy-Corbin Planting Company, Inc. (Desona). On the day of the building purchase, ECCS and the Sheriff's Office entered into a lease agreement, pursuant to which the latter agreed to pay ECCS 25% of the funds it received from the Louisiana Department of Public Safety and Corrections for housing state prisoners.

A few months later, August 1990, ECDC began housing prisoners. Additional buildings were constructed, also financed by loans from

Desona.  Until May 1993, ECCS repaid the construction loans, making no shareholder distributions except as needed for payment of taxes under the subchapter S corporate structure; thereafter, shareholder distributions were made.

The parties went to elaborate lengths to conceal Rinicker's interest in, and his distributions from ECCS.  From May 1993 through August 1995, ECCS made distributions to Morgel based on a 35% interest in ECCS (her 5% and Rinicker's 30%).

Although Morgel had a checking account at a bank in Lake Providence, where she lived, she opened another in May 1993 in Oak Grove, 15 miles away.  She deposited the ECCS distribution checks in the Oak Grove account, and then wrote checks, generally for less than $10,000 (to avoid currency transaction reporting requirements), payable to Glen Jordan, Rinicker's friend.

These May 1993 through August 1995 payments totaled $286,025. After August 1995, by six checks totaling $54,116, ECCS paid Jordan directly (on behalf of Rinicker).

Rinicker and/or Jordan cashed these checks at a bank in Monroe, Louisiana, where Rinicker's sister, Myra Jackson, worked. Rinicker received the proceeds, giving Jordan a small amount from each check.

When questioned by the Louisiana Office of Legislative Auditor and the FBI regarding the payments to Jordan, Morgel and Wyly gave false explanations and incorrect information.  Jordan, however, cooperated with investigators and explained his role in funneling money to Rinicker.

- 4 -

Wyly, Morgel, ECCS, Rinicker, and Jackson (but *not* Jordan), were charged with mail fraud, conspiracy to launder money, and money laundering. The indictment sought forfeiture of: (1) ECDC; (2) a certificate of deposit purchased by ECCS; (3) all funds in ECCS' bank account; (4) all funds in Morgel's Oak Grove account; (5) ECCS' assets and property, including approximately $2.8 million in rental payments from the Sheriff's Office; and (6) the approximate $340,000 paid Rinicker.

Jackson's charges were dismissed pursuant to a pre-trial diversion agreement. Rinicker pleaded guilty and testified at trial for the Government.

A jury convicted Wyly, Morgel, and ECCS on all counts, and found the charged property to be subject to forfeiture. Departing downward from the Sentencing Guidelines' range, the district court sentenced Wyly to 48 months imprisonment and a $17,500 fine and Morgel to prison for one year and one day and a $12,500 fine. ECCS was fined $4.8 million. Moreover, Wyly, Morgel, and ECCS were ordered to forfeit their interests in the property described in the forfeiture verdict.

Following entry of an initial forfeiture order, the other ECCS shareholders (Hamilton and members of Wyly's family) petitioned for a hearing on their claims to an interest in ECCS' assets. The district court held they lacked standing.

## II.

The district court refused the Government's downward departure request for Rinicker and sentenced him, *inter alia*, to 60 months

imprisonment and a $10,000 fine.  His appeal was voluntarily dismissed.  Likewise, the Government voluntarily dismissed its appeal contesting the departures given Wyly and Morgel.

Wyly, Morgel, and ECCS (Appellants) challenge the admission of Rinicker's testimony, the sufficiency of the evidence, certain jury instructions, the denial of their new trial motions based on prosecutorial misconduct, and the forfeiture order; in addition, ECCS challenges its fine.  The other ECCS shareholders contest being denied a hearing.

## A.

Circuit precedent forecloses the contention that Rinicker's testimony, pursuant to a plea agreement, violated 18 U.S.C. § 201(c)(2) (prohibiting giving, offering, or promising anything of value to a witness for or because of his testimony).  *E.g.*, **United States v. Haese**, 162 F.3d 359, 366-68 (5th Cir. 1998), *cert. denied*, ___ U.S. ___, 119 S. Ct. 1795 (1999).

## B.

> The scope of our review of the sufficiency of the evidence after conviction by a jury is narrow.  We must affirm if a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. We must consider the evidence in the light most favorable to the government, including all reasonable inferences that can be drawn from the evidence.  The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence.

***United States v. Bermea***, 30 F.3d 1539, 1551 (5th Cir. 1994), (citations omitted), *cert. denied*, 513 U.S. 1156, *and* 514 U.S. 1097 (1995).

1.

Bribery under Louisiana law is the offense the mail fraud scheme was devised to further and conceal; that scheme and bribery produced the illegal proceeds for laundering and concealment. Therefore, as the parties acknowledge, bribery is an essential element for each of the counts in the indictment. The evidence of bribery is claimed insufficient because Wyly *and Rinicker* denied any intent to offer or receive a bribe; that, instead, Rinicker extorted an ownership interest in ECCS *after* ECCS was formed; and that later acts of concealment had a non-criminal purpose because they were undertaken, *not to cover up a bribe*, but out of fear of Rinicker, who wanted his ownership concealed for his own purposes.

Under LA. REV. STAT. 14:118, the elements for public bribery are "(1) [t]he giving or offer to give of something of apparent present or prospective value by the Defendant; (2) [t]hat the recipient is a public officer or public employee ...; and (3) [t]hat the gift or offer to give is for the purpose of influencing the official duties of the public officer or employee". ***United States v. L'Hoste***, 609 F.2d 796, 804-05 (5th Cir.), *cert. denied*, 449 U.S. 833 (1980).

The bribery evidence is more than sufficient. The Government presented evidence of an offer by Wyly and acceptance by Rinicker, an elected official, of a concealed interest in ECCS, for the purpose of influencing Rinicker in the performance of his official

duties.  Although Rinicker testified that he did not think Wyly offered him a secret ownership interest in ECCS as a bribe, he also testified that he believed the arrangement was illegal.  The jury was entitled to reject Wyly and Morgel's claims that, because they feared Rinicker, they acted without specific intent, and to find, instead, that their efforts to conceal Rinicker's interest and the payments to him were undertaken with the requisite specific intent.

2.

"To establish a mail fraud violation under 18 U.S.C. § 1341, the government must demonstrate (1) a scheme to defraud; (2) the use of mails to execute that scheme; and (3) the defendant's specific intent to commit fraud."  **United States v. Tencer**, 107 F.3d 1120, 1125 (5th Cir.), *cert. denied*, ___ U.S. ___, 118 S. Ct. 390 (1997).

Appellants were charged with using the mails in furtherance of a scheme to defraud the parish citizens of the honest and faithful services of their sheriff, the object of the scheme being to promote and cover up the bribe.  The mailings at issue were for invoices for housing prisoners from the Sheriff's Office to the Department of Corrections (DOC), and checks in payment of them.

Appellants maintain that the charged scheme cannot be prosecuted under the mail fraud statute because the indictment and evidence did not narrow the alleged victims to a specified class to whom Rinicker owed a state-law duty; and that the mailings were not related to, or in furtherance of, the scheme to conceal the bribery but were, instead, legitimate payments pursuant to the contract

between the Sheriff's Office and DOC. Morgel contends further that there was insufficient evidence that she knowingly caused the items to be mailed or that she knew, or should have known, that the Sheriff's Office would participate in the mailings.

The indictment charged, and the Government proved, that, in exchange for authorizing the lease of ECDC by the Sheriff's Office from ECCS, Rinicker received a hidden ownership interest in, and a share of, proceeds from ECCS, in violation of state criminal law. *See* **United States v. Brumley**, 116 F.3d 728 (5th Cir. 1997) (en banc). The Government proved that the scheme encompassed the incorporation of ECCS, the purchase and renovation of ECDC, and housing prisoners at ECDC in exchange for DOC payments. Each mailing furthered the scheme by generating funds used to bribe Rinicker.

The Government also proved Morgel's involvement in all aspects of the scheme; her knowledge that the DOC funds would be used to pay ECCS and, after being laundered through her bank account, to pay bribes to Rinicker; and that the use of the mails was foreseeable to her. "[W]hen an individual does an act with the knowledge that the use of the mails will follow in the ordinary course of business, or when such use can *reasonably be foreseen, even though not actually intended*, then he/she causes the mails to be used". **United States v. Moser**, 123 F.3d 813, 822-23 (5th Cir. 1997) (emphasis in original; internal quotation marks and citation omitted), *cert. denied*, ___ U.S. ___, 118 S. Ct. 613, 642 (1997), *and* 118 S. Ct. 884 (1998); *see also* **United States v. Green**, 964

F.2d 365, 369 (5th Cir. 1992) (defendant need not be involved directly in mailings; sufficient to show defendant acted with knowledge that use of mails would follow in ordinary course of business), *cert. denied*, 506 U.S. 1055 (1993).

3.

Money laundering was charged under 18 U.S.C. §§ 1956(a)(1) and 1957.

a.

Seven counts charged § 1956(a)(1) violations. They involved checks drawn on the Sheriff's Office account and deposited in ECCS' account, on ECCS' account and deposited in Morgel's account, and on ECCS' and Morgel's accounts payable to Jordan (on behalf of Rinicker) and cashed at a bank in Monroe.

For a conviction under 18 U.S.C. § 1956(a)(1), the Government must prove that the defendant (1) conducted or attempted to conduct a financial transaction, (2) which the defendant knew involved the proceeds of a specified unlawful activity, (3) with the intent either to promote specified unlawful activity (§ 1956 (a)(1)(A)(i)), *United States v. Cavalier*, 17 F.3d 90, 92 (5th Cir. 1994), or to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity (§ 1956 (a)(1)(B)), *Tencer*, 107 F.3d at 1128. *See also United States v. Brown*, ___ F.3d ___, ___, 1999 WL 642214, at *5 & n.11 (5th Cir. 1999).

Appellants contend that the Government failed to prove that the proceeds involved bribery rather than extortion and that they

acted with the specific intent to engage in the transactions; and claim that the funds at issue were not criminally derived property, because the bribery scheme was not consummated until Rinicker received the funds. They also assert that the proceeds were not illegal because the Government failed to prove that DOC would not have agreed to house prisoners at ECDC had it known that the Sheriff had an interest in the corporation that owned ECDC.

As discussed *supra*, the jury was entitled to find bribery. Further, there was ample evidence that Appellants knowingly conducted financial transactions which involved the proceeds of mail fraud and/or public bribery, and that they intended to promote the unlawful activity or to conceal or disguise the nature and source of the proceeds. The contention that the bribery scheme was not consummated until Rinicker received the funds is inconsistent with the Louisiana public bribery statute, which criminalizes the offer or acceptance of anything of present or prospective value.

### b.

The § 1957 count concerns the certificate of deposit (CD) purchased by ECCS. "To obtain a conviction under § 1957, the government must prove that the defendant knowingly engaged, or attempted to engage, in a monetary transaction involving criminally derived property, in excess of $10,000, derived from specified criminal activity". **United States v. Leahy**, 82 F.3d 624, 635 (5th Cir. 1996).

We reject the contention that funds paid ECCS for use of ECDC were legitimate; and that, therefore, funds used by ECCS to

purchase the CD were not proceeds of unlawful activity.  The payments by the Sheriff's Office to ECCS were proceeds of the mail fraud and bribe.

4.

ECCS asserts that, because the jury rejected Wyly's testimony that he was extorted by Rinicker, it must have credited Rinicker's testimony that the illegal agreement was entered into *before* ECCS was formed; and that, therefore, the evidence was insufficient to find that, in bribing Rinicker, Morgel and Wyly acted with apparent authority for ECCS prior to its creation.

The evidence was more than sufficient to support the jury's conclusion that Wyly and Morgel acted on behalf of ECCS during the relevant time period.

C.

The jury was charged on the day *after* closing arguments, in which Morgel and Wyly focused on their defense that they did not specifically intend to violate the law; that, instead, Rinicker extorted them and they, being much older, were afraid of him. Moreover, Morgel claimed several times that she had *not* received any financial benefit from the scheme.

In rebuttal, the Government argued, *for the first time*, that Morgel and Wyly could not have been afraid of Rinicker because they cheated him out of $195,000.  The Government had neither questioned its witnesses, nor cross-examined Morgel, about this purported theft.

For this position, the Government relied on its Ex. 10 (G-10) and Defense Ex. 44 (D-44). G-10 is a chart entitled "ECCS MONEY TRAIL", representing that: DOC paid ECDC $12,093,251; ECDC paid ECCS 25% of that amount, $2,820,961; of this, ECCS shareholders other than Morgel received $1,258,704; she received $526,367, of which she paid Jordan $286,025 (for Rinicker); ECCS paid Jordan $54,116 (for Rinicker); and Jordan paid Rinicker $340,141 (amount Jordan received from Morgel and ECCS).

Based on this, the Government argued that $535,129 was Rinicker's 30% share of the approximate $1.8 million shareholder distributions ($526,367 to Morgel and $1,258,704 to others), but that he received only $340,141. Therefore, according to the Government, Morgel had stolen $195,380: the difference between the $535,129 Rinicker should have received (his 30%) and the $340,141 actually received.

Morgel objected at a bench conference, claiming a blatant mischaracterization of the record, because the evidence showed that Morgel paid taxes on behalf of Rinicker; and that it was improper for the Government to hold this argument until rebuttal, when Morgel could not reply. The objection was overruled, on the basis that the argument was not evidence.

Continuing its rebuttal, the Government referenced D-44, a chart entitled "DOROTHY MORGEL, Income Tax Paid 1992-1996", which presented her wages as $50,246; funds received from ECCS as $702,837; and paid income tax as $221,859. According to the Government, D-44 demonstrated that $195,000 was the difference

between the amount Morgel received from ECCS ($702,837) and the sum of $221,758 for taxes and $286,025 Morgel paid to Jordan (for Rinicker), this $195,000 difference being the same as reflected on G-10; and it again asserted that Morgel had stolen that amount from Rinicker. *Defense counsel did not object*.

The Government then argued that Morgel and Wyly could not have been afraid of Rinicker because they "didn't have a problem clipping him out of $195,000 of his share"; that G-10 and D-44 were "credible, absolutely reliable evidence" that there had not been any fear; that "there is no honor among thieves, obviously, because the thieves were stealing from the thief"; and that the claimed theft was "not a dispute.  That's not a guess.  That's a fact". *Once again, Wyly and Morgel did not object*.

On the morning *following* closing arguments, in a bench conference prior to the jury being charged, Appellants moved for a mistrial.  In the alternative, they requested surrebuttal or that the court instruct the jury to disregard the challenged rebuttal. The district judge stated that he had been surprised and concerned on hearing the rebuttal about the $195,000; but that he had also been surprised when Morgel had argued earlier that she received nothing.  The court concluded that the rebuttal was fair, remarking that it had struggled with the matter, and had considered, but decided against, reopening the argument for Morgel and the Government.

The parties were permitted to state objections on the record. Morgel asserted that the Government had not presented evidence of

such claimed theft; that the Government's calculations did not account for repayment of ECCS' debt in 1992 and 1993, and disregarded the tax consequences of a subchapter S corporation; and that she was unable to correct the error because it was made in rebuttal. Wyly pointed out that Rinicker received distributions for which taxes had already been paid by Morgel; and that the $195,380 difference was 36% of Rinicker's 30% share.

The Government responded that it had properly answered arguments that Rinicker was a thief and that Morgel had received nothing; that G-10 and D-44 showed $240,000 unaccounted for in Morgel's account; and that it did not know the amount of taxes paid.[1]

The court denied a mistrial, as well as the requested instruction to disregard the challenged rebuttal. It found that the argument was not improper because it was based on exhibits in evidence and was responsive to Morgel's received-nothing argument. However, just before, and during, the charge, the court instructed that counsels' arguments were not evidence; that it consists only of the testimony of witnesses and exhibits; and that the jury was to decide the case solely on the evidence.

Post-verdict, Appellants moved for a new trial based, *inter alia*, on the rebuttal, asserting that the Government knew that Morgel had paid Rinicker's tax share from funds deposited in her account; that D-44 represented funds that were allocated to Morgel

---

[1]As discussed *infra*, this claimed lack of knowledge is quite inconsistent with an earlier Government TRO filing, in which the same Assistant United States Attorney participated.

for tax purposes, some of which she received in cash and some that were paid by ECCS to Desona in repayment of construction loans, but taxable as income to ECCS shareholders; that the interpretation of D-44 was erroneous because it failed to account for Morgel's 5% interest in ECCS, federal and state taxes paid by Morgel on her salary and other non-ECCS income, and $208,903.27 in loan repayments; and that it was undisputed that no cash was distributed prior to 15 May 1993, except for taxes.

Appellants also pointed out that 35% (Morgel and Rinicker's combined share) of ECCS' $596,866.49 total loan payments is $208,903.27, the amount claimed unaccounted for on D-44. Finally, they asserted that Agent Rushing's affidavit, submitted in support of the Government's February 1996 TRO motion to prevent the sale of ECDC, approximately 18 months before trial, *see* note 1, *supra*, accounted for all ECCS distributions; showed that Morgel received only $526,367 from ECCS; refuted the argument that D-44 reflected that Morgel actually received $702,837; acknowledged that Rinicker benefitted in excess of $570,000, because taxes were paid on his behalf; and confirmed that, except for distributions for taxes, no shareholder distributions were made until May 1993, after ECCS repaid its loans. As exhibits, Appellants included ECCS' loan payment checks.

The district court denied a new trial, holding that Appellants' *alternate* explanations for the $195,000 (loan repayments or taxes) undermined their contention that the rebuttal was false; and that the explanations by Appellants and the

Government were plausible alternate theories for what happened to the $195,000. The court noted that the testimony and documents underlying the new trial motions were in evidence; therefore, defense counsel had been free to make any arguments based upon that evidence, and the jury had been able to consider it in assessing the rebuttal.

"Criminal convictions are not to be lightly overturned on the basis of a prosecutor's comments standing alone." *United States v. Pineda-Ortuno*, 952 F.2d 98, 106 (5th Cir.), *cert. denied*, 504 U.S. 928 (1992). Accordingly, "[a] criminal defendant bears a substantial burden when attempting to show that prosecutorial improprieties constitute reversible error". *Bermea*, 30 F.3d at 1563. "A conviction should not be set aside if the prosecutor's conduct ... did not in fact contribute to the guilty verdict and was, therefore legally harmless". *United States v. Johnston*, 127 F.3d 380, 390 (5th Cir. 1997), *cert. denied*, ___ U.S. ___, 118 S. Ct. 1173, 1174, 1577 (1998).

"The standard of review for a denial of a motion for mistrial is abuse of discretion." *United States v. Bentley-Smith*, 2 F.3d 1368, 1378 (5th Cir. 1993).[2] "In reviewing a claim of

---

[2]Arguably, in that the only contemporaneous objection to the rebuttal concerned G-10, the other now objected-to portions of the rebuttal, including remarks about D-44, should be reviewed *only* for plain error. *Cf*. *United States v. Gallardo-Trapero*, ___ F.3d ___, ___, 1999 WL 604316, at *12 (reviewing unobjected-to portions of prosecutor's closing argument for plain error); *United States v. Causey*, ___ F.3d ___, ___, 1999 WL 618124, at *9 (5th Cir. 1999)(same). However, in that the unobjected-to remarks were, in effect, part and parcel of the objected-to theft claim, we review under our normal abuse of discretion standard.

prosecutorial misconduct, [we] first determine[] whether the prosecutor's remarks were improper". *United States v. Fields*, 72 F.3d 1200, 1207 (5th Cir.), *cert. denied*, 519 U.S. 807 (1996); *see also United States v. Gallardo-Trapero*, ___ F.3d ___, ___, 1999 WL 604316, at *9 (5th Cir. 1999). If they were, we consider "whether they prejudicially affected the substantive rights of the defendant". *Fields*, 72 F.3d at 1207; *United States v. Cooks*, 52 F.3d 101, 103 (5th Cir. 1995) (footnotes omitted).

The rebuttal is claimed improper because the Government, knowing that the accusation was false, accused Wyly and Morgel of uncharged theft, deliberately waiting until they had no opportunity to respond. The Government counters that it responded fairly to Wyly and Morgel's closing arguments, in which they accused Rinicker of extortion and theft and asserted that their actions were based on fear, as well as Morgel's that she did not receive any money from the scheme. On this record, the better approach is to assume that the rebuttal was improper, placing prejudice *vel non* at issue.

Appellants contend that the rebuttal prejudiced their right to a fair trial because it undermined the heart of their defense — acting out of fear of Rinicker. The Government responds that, in the light of the overwhelming evidence of guilt, there was no prejudice.

For deciding whether prosecutorial misconduct constitutes reversible error, "[w]e consider three factors: (1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction". **United States v. Hernandez-Guevara**, 162 F.3d 863, 874 (5th Cir. 1998), *cert. denied*, ___ U.S. ___, 119 S. Ct. 1375 (1999).

"The magnitude of the prejudicial effect is tested by looking at the prosecutor's remarks in the context of the trial in which they were made and attempting to elucidate their intended effect. At the same time, the district court's on-the-scene assessment of

the prejudicial effect, if any, is *entitled to considerable weight*". **Fields**, 72 F.3d at 1207 (emphasis added). This is in keeping with the earlier discussed rule that, "[f]or prosecutorial misconduct to warrant a new trial, it must be so pronounced and persistent that it permeates the entire atmosphere of the trial, ... and casts *serious doubt* upon the correctness of the jury's verdict". **United States v. Wallace**, 32 F.3d 921, 926 (5th Cir. 1994) (emphasis added; internal quotation marks and citation omitted).

The jury had the testimony regarding ECCS' loan repayments, the date it began making distributions to shareholders, and Morgel's tax payments on behalf of Rinicker. Also in evidence was Morgel's Oak Grove check register, showing deposits and payments to Jordan (for Rinicker), the IRS, and the Louisiana Department of Revenue. There was also considerable testimony regarding Rinicker's violent temper and his threats, not only from Morgel, Wyly, and other defense witnesses, but also from Government witnesses, including Rinicker. Under these circumstances, the jury's ability to fairly consider and evaluate the evidence was not hampered unduly by the rebuttal. Restated, the magnitude of the prejudicial effect is not so great as to compel reversal, especially in the light of the other two factors to be considered: efficacy of cautionary instructions and evidence supporting conviction.

"We presume that the jury follows the instructions of the trial court unless there is an overwhelming probability that the

jury will be unable to follow the instruction and there is a strong probability that the effect [of the prosecutorial misconduct] is devastating." *United States v. Tomblin*, 46 F.3d 1369, 1390 (5th Cir. 1995) (internal quotation marks and citation omitted). As noted, the court twice instructed (prior to and during the charge) that the arguments by counsel were not evidence and that the case was to be decided solely on the evidence. *See Gallardo-Trapero*, ___ F.3d at ___, 1999 WL 604316 at *10-11 ("district court helped to mitigate any prejudicial effect [of Government's improper argument] by instructing the jury to base their decision solely upon the testimony and evidence presented").

Moreover, the timing of the charge also mitigated any prejudicial effect. The charge, *not closing arguments*, immediately preceded the jury's deliberations. *See* FED. R. CRIM. P. 30 ("[t]he court may instruct the jury before or after the arguments are completed or at both times"). Further mitigating any prejudicial effect was the fact that closing arguments were completed late in the afternoon of 14 October; the jury was not charged, and, therefore, did not conduct its deliberations, until the next day.

Finally, the evidence of guilt was overwhelming. *See Gallardo-Trapero*, ___ F.3d at ___, 1999 WL 604316 at *11 (Government's improper closing argument did "not outweigh the strength of the multifaceted evidence and testimony presented during trial"). For this factor, no more need be said.

In sum, assuming the rebuttal was improper, the requisite prejudice has not been demonstrated. Restated, the rebuttal did

not preclude Appellants' receiving a fair trial.[3]  There was no abuse of discretion.

D.

Appellants challenge the jury's being instructed on the affirmative defense of duress, and that a scheme to commit public bribery is a breach of the duty owed by Rinicker to the parish citizens.  And, *for the first time on appeal*, ECCS challenges the corporate criminal liability instruction.

"We review an included jury instruction objected to as inaccurate for abuse of discretion and will reverse only if the instruction fails correctly to state the law."  *United States v. Hebert*, 131 F.3d 514, 521 (5th Cir. 1997), *cert. denied*, ___ U.S. ___, 118 S. Ct. 1571 (1998).  "The trial judge has substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented."  *Bentley-Smith*, 2 F.3d at 1378 (internal quotation marks and citation omitted).  "To determine whether there was error, [we] look[] at the entire charge in the context of the trial including arguments made to the jury."  *United States v. Willis*, 38 F.3d 170, 179 (5th Cir. 1994) (internal quotation marks and citation omitted), *cert. denied*, 515 U.S. 1145 (1995).  "Reversible error exists when the jury charge, as a whole,

---

[3]Our no-prejudice holding does *not* lessen our great concern, notwithstanding the Government's explanation on appeal, over the glaring inconsistencies between the Government's TRO papers and rebuttal.  Those papers seem to account for every penny, including tax payment distributions and loan repayments, yet the rebuttal argument took a quite different course, including, as noted, disavowing knowledge of the amount of taxes paid.  That the TRO papers had been filed 18 months before trial is no excuse for this claimed lack of knowledge.

misled the jury as to the elements of the offense." ***United States v. Devoll***, 39 F.3d 575, 579 (5th Cir. 1994) (internal quotation marks and citation omitted), *cert. denied*, 514 U.S. 1067 (1995).

On the other hand, we review ECCS' belatedly raised contention, discussed *infra*, *only* for plain error.

1.

Appellants' theory of defense was that Rinicker extorted money from them, threatening to close the prison unless paid; and that, because they feared him, they acted in good faith and without specific intent. They acknowledge that they presented duress evidence (threats and intimidation by Rinicker), but maintain that they did not assert the affirmative defense of duress; and that, by giving such an instruction, the court undermined their theory of defense, shifted the burden of proof on intent, and confused the jury on the application of the good faith and specific intent instructions.

The Government did not cite, nor could we find, any authority approving giving an instruction on an affirmative defense, for which the defendant bears the burden of proof, when that defense had not been raised. The Government maintains, however, that the court had discretion to give the instruction, regardless of whether requested by the defense.

On the other hand, Appellants did not cite, nor could we find, any authority to support their contention that, in a criminal case, giving an instruction on a not-asserted affirmative defense is reversible error. Instead, they rely on the well-settled

proposition that "[a] judge may not instruct the jury on a charge that is not supported by evidence", **United States v. Ortega**, 859 F.2d 327, 329-30 (5th Cir. 1988), *cert. denied*, 489 U.S. 1027 (1989); and maintain that the evidence did not support duress.

> To raise an issue of duress for the jury a defendant must present proof of four elements:
>
> > (1)   that the defendant was under an unlawful and present, imminent, and impending threat of such nature as to induce a well-grounded apprehension of death or serious bodily injury;
> >
> > (2)   that defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct;
> >
> > (3)   that defendant had no reasonable legal alternative to violating the law; a chance both to refuse to do the criminal act and also to avoid the threatened harm; and
> >
> > (4)   that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm.

**United States v. Posada-Rios**, 158 F.3d 832, 873 (5th Cir. 1998) (brackets, internal quotation marks, and citations omitted), *cert. denied*, ___ U.S. ___, 119 S. Ct. 1280, 1487, 1792 (1999).   Because "a justification defense such as duress is an affirmative defense, the burden of proof is on the defendant".   **Willis**, 38 F.3d at 179.

The evidence did *not* support a duress defense.   For example, Wyly admitted that there had been an alternative to violating the law:   he could have had a public entity other than the Sheriff's

- 24 -

Office sponsor the prison. Accordingly, it was error for the court to instruct the jury on that defense, especially in view of the fact that, not only did Appellants *not* request the instruction, *they objected to it.*

Nevertheless, the error is harmless because, viewing the instructions as a whole, we are convinced that the jury was not misled or confused. The court instructed on good faith, specific intent, and the definitions of "knowing" and "willful"; that the Government had the burden of proving that Appellants did *not* act in good faith, but instead acted with the specific intent to violate the law.

Under the instructions, the jury could find that Appellants did *not* act under duress, but still find that the Government *failed to prove* that they acted with the requisite specific intent. That it rejected the good faith defense and found specific intent does not mean that it was confused or misled by the duress instruction. Accordingly, that instruction did not affect Appellants' substantial rights.

2.

The jury was instructed that a scheme to commit public bribery is a breach of the duty owed by the sheriff to the parish citizens. Appellants contend that this instruction usurped the jury's function to decide whether, notwithstanding the bribes, Rinicker fulfilled his official duties.

We disagree. The jury still had to determine whether the elements of public bribery had been proven.

As noted, ECCS' belated challenge to the corporate criminal liability instructions is reviewed *only* for plain error, pursuant to FED. R. CRIM. P. 30 and 52(b). "Under [Rule] 52(b), [we] may correct forfeited errors only when the appellant shows (1) there is an error, (2) that is clear or obvious, and (3) that affects his substantial rights. If these factors are established, the decision to correct the forfeited error is *within the sound discretion of the court*, and the court will *not* exercise that discretion unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings". **United States v. Waldron**, 118 F.3d 369, 371 (5th Cir. 1997) (internal quotation marks and citation omitted) (emphasis added).

Relying on **Standard Oil Co. of Tex. v. United States**, 307 F.2d 120, 128 (5th Cir. 1962), ECCS maintains that the challenged instructions should have required the jury to determine that Wyly and Morgel were acting with the intent to benefit ECCS. Such an instruction was unnecessary, because the evidence is overwhelming that ECCS was the alter-ego for Morgel and Wyly and that they were the only agents who acted for it.

But, even assuming a clear or obvious error that affected ECCS' substantial rights, we decline to exercise our discretion to correct it, because it does not affect the fairness, integrity, or public reputation of judicial proceedings. ECCS jointly submitted the corporate criminal liability instructions.

E.

The forfeiture statute for money laundering provides for forfeiture of property "involved in" the offense or property "traceable to such property".  *See* 18 U.S.C. § 982(a)(1) ("The court, in imposing sentence on a person convicted of an offense in violation of ... section 1956 ... of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.").

1.

Appellants challenge the forfeiture of ECCS' assets on the grounds that the only proceeds of bribery and mail fraud available for laundering were the funds paid to Rinicker; and that forfeiture is not authorized under a facilitation theory, unless the facilitation involves intentional commingling of legitimate and tainted funds as a method for concealing and laundering "dirty" money, which is not present here.  The Government responds that *ECDC is the only asset forfeited under a facilitation theory* (this point is of importance concerning the forfeiture of the funds in Morgel's account, part II.E.2. *infra*), and asserts that property "involved in" money laundering includes property used "to facilitate" the offense, as the jury was instructed.

"Facilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance."  **Tencer**, 107 F.3d at 1134 (internal quotation marks and citation omitted).  The facilitation theory supports the jury's finding that ECDC was forfeitable, because of its substantial nexus

to the crimes.  It, the prison, was the source of the criminal proceeds and was indispensable to the money laundering conspiracy. Without the prison, there could have been no bribery, mail fraud, or money laundering.  ECCS' other forfeited property is forfeitable as proceeds.

2.

Morgel contends that the Government failed to prove a connection between the charged illegal activity and funds that remained in her checking account at the time of seizure, ten months after her last payment to Jordan (for Rinicker).  In closing argument during the forfeiture phase, Morgel's counsel stated that her account had "$5,840.57 of her money in it"; but, at oral argument on appeal, her counsel stated that, when seized, the account contained approximately $15,000.

The Government does not respond in its appellate brief to this contention.  In an objection to Morgel's closing argument, the Government stated that "the forfeiture theory for [her] account is that it was used to facilitate funneling of money to Rinicker". But, as noted, it now expressly disavows reliance on a facilitation theory for the forfeiture of *any property other than ECDC*. Accordingly, this forfeiture of funds cannot be upheld on the ground that Morgel's account was the conduit for laundering the funds.  Instead, the Government had to prove that those funds were criminal proceeds.

The Government asserted at oral argument on appeal that all funds in Morgel's account came from ECCS; but, it seemed to concede

that, if they did not, they would *not* be forfeitable.  At trial, the Government presented no evidence regarding either the amount or source of these funds when seized. Accordingly, the evidence is insufficient to sustain their forfeiture.

F.

In **United States v. Bajakajian**, 524 U.S. 321, 118 S. Ct. 2028 (1998), decided after Appellants' sentencing, the Supreme Court held that "a punitive forfeiture violates the Excessive Fines Clause [of the Eighth Amendment] if it is grossly disproportional to the gravity of a defendant's offense".  524 U.S. at ___, 118 S. Ct. at 2036.  The district court's proportionality determination is reviewed *de novo*, but its factual findings "in conducting the excessiveness inquiry ... must be accepted unless clearly erroneous".  524 U.S. at ___, 118 S. Ct. at 2037 & n.10.

ECCS maintains that the forfeiture of more than $4 million in assets is grossly disproportionate, claiming its involvement in the scheme is questionable; and noting the charged laundering was for only approximately $175,000 and Rinicker received only approximately $340,000; much of its stock is owned by individuals with no knowledge of, or involvement in, the crime; and it was also fined $4.8 million.

The district court held that the forfeiture was not disproportionate because ECCS was convicted of a comprehensive criminal conspiracy involving bribery of the highest ranking law enforcement officer in the parish; the scheme continued for more than six years and involved manipulation of various financial

accounts and institutions and at least five individuals; the forfeited property was closely related to the money laundering offenses; ECCS and ECDC were born out of the scheme to defraud the citizens of the parish of the honest and faithful services of their sheriff; the money paid Rinicker flowed through the forfeited bank accounts; and the CD was purchased with funds derived from the conspiracy.

The factual findings are not clearly erroneous. Nor did the court err in concluding that the forfeiture was not grossly disproportionate.

## G.

ECCS contends, *for the first time on appeal*, that the district court misapplied the Guidelines in computing the $4.8 million fine; the Government agrees. It notes, however, that, because all of ECCS' assets have been forfeited, it will remit the fine if the forfeiture order is affirmed.

In other words, the issue will be moot. Because the forfeiture of ECCS' assets has been upheld, the Government must remit the fine.

## H.

ECCS shareholders (other than the defendants) petitioned for a hearing on their claims to an interest in ECCS' assets, pursuant to 21 U.S.C. § 853(n). That subsection provides, in pertinent part, that, following entry of a forfeiture order, "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States ... may ...

petition the court for a hearing to adjudicate the validity of his alleged interest in the property". 21 U.S.C. § 853(n)(2).

The district court denied a hearing, holding that the shareholders lacked standing. "The issue of standing is one of law, and our review is plenary". *United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1111 (5th Cir. 1992).

The shareholders bottom standing on their claim to an equitable interest in the corporate assets, maintaining that the § 853(n)(2) phrase, "legal interest", includes equitable and beneficial interests. They contend further that the Government cannot seek to forfeit ECCS unless it also seeks to forfeit their stock, and that the district court erroneously failed to differentiate between their claims to "[ECCS] itself, *i.e.*, shares of stock which they held" and their claims to "specific assets" of ECCS.

The district court did not order forfeiture of the stock or the "corporation itself", only its assets. Under Louisiana law, "[a] corporation is a separate entity from its shareholders". *Fina Oil & Chemical Co. v. Amoco Production Co.*, 673 So. 2d 668, 672 (La. App. 1st Cir.), *writ denied*, 679 So. 2d 1353 (La. 1996). Accordingly, "[t]he shareholders' interest in the corporation does not equate to ownership by the shareholder of specific corporation assets". *Id.; see also* *Succession of Mydland*, 653 So. 2d 8, 11 (La. App. 1st Cir. 1995) ("The property of the corporation is not the property of the individual shareholders"). "A shareholder's

ownership interest in the corporation is in the stock issued by the corporation and *not* the corporate assets". ***Id***. (emphasis added).

The shares are *not* the "corporation itself", nor are they ECCS' assets or property. Because only ECCS' assets, in which the shareholders have no interest under Louisiana law, were ordered forfeited, the no-standing ruling was correct.

III.

For the foregoing reasons, the judgment against Wyly and the denial of the shareholders' claim are **AFFIRMED**. The judgment against Morgel is **AFFIRMED**, except for the forfeiture of her seized account funds, which is **REVERSED**. And, the judgment against ECCS is **AFFIRMED**, except for the $4.8 million fine, which is **VACATED**.

*AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART*