**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 00-10337

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS


DAVID LADON CRADER and GERALD KENNETH ECKERT,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas
(5:99-CR-92)
_____

July 2, 2001

Before HIGGINBOTHAM, DAVIS, and BENAVIDES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[*]

David Crader, Gerald Eckert, and Jeffrey Echols were indicted on multiple charges of mail fraud, false claims, false statement to a federal agency, fraud in connection with Social Security payments, controlled substance offenses, money laundering, and conspiracy, in violation of 18 U.S.C. §§ 287, 371, 1001, 1010, 1341, and 1956; 42 U.S.C. §§ 408(a)(4) and 1383a(a)(3); and 21 U.S.C. §§ 841(a)(1), 843(b), and 846. The core charges in the indictment alleged that Crader, Eckert, and Echols defrauded

[*]Pursuant to 5ᵗʰ Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5ᵗʰ Cir. R. 47.5.4.

clients of the South Plains Aids Resource Center ("SPARC") and various federal and private entities that provided grants to SPARC. Echols died five days before trial. Crader and Eckert were tried and convicted on more than seventy counts. They now appeal these convictions on multiple grounds. For the reasons that follow, we AFFIRM the judgment of the district court.

I.

The South Plains AIDS Resource Center of Lubbock, Texas, is a non-profit, tax-exempt organization that was formed in 1989 to provide direct services to persons afflicted with Acquired Immune Deficiency Syndrome ("AIDS") or Human Immunodeficiency Virus ("HIV"), and to provide community education on those diseases. SPARC received its primary funding from federal grants, and additional funding from non-governmental charitable entities.

Defendant-Appellant David Crader was Executive Director of SPARC; Defendant-Appellant Gerald Eckert was the Care Coordinator and generally considered the "number two" man. Jeffrey Echols, who died five days before trial, was the Special Care Coordinator. The multiple count indictment of all three men arose from their activities in running SPARC. In essence, the government presented evidence designed to show that the defendants concocted and carried out a scheme to create a "cash hoard" by overcharging their clients and fraudulently obtaining funds from various grant programs. The government's evidence also tended to show that the defendants used this "cash hoard" for two purposes: to benefit themselves and to secretly pay the salaries and expenses of favored SPARC clients

2

whose social security benefits would have been terminated or reduced if this additional income had been disclosed. The government also charged the defendants with controlled substance violations for stockpiling the medication of deceased clients and unlawfully dispensing it to living clients without a doctor's prescription.

At trial, the government presented specific evidence that the defendants defrauded several federal programs providing help to AIDS patients. For example, the Housing Opportunities for Persons with AIDS ("HOPWA") program, a United States Department of Housing and Urban Development ("HUD") initiative, provided funds for rent and utilities for individuals with AIDS or HIV. SPARC administered this program in the Lubbock area beginning in 1993. The HOPWA rules generally required aid recipients to contribute the greater of ten percent of their gross income or thirty percent of their adjusted gross income towards their rent, and the balance was subsidized through HOPWA funds. SPARC collected more rent from the clients than the regulations allowed, and then obtained grants on the assumption that the clients had paid the smaller, correct portion of the rent. The government argued at trial that by charging and collecting excess rent from clients while also receiving federal assistance, defendants engaged in a "double-dipping," resulting in both SPARC clients and the federal government being defrauded.[1]

---

[1]The government produced evidence that the defendants also defrauded several other organizations by either engaging in the

3

The evidence at trial showed that the defendants used a portion of the funds they accumulated to secretly pay salaries of favored SPARC clients. Because those favored SPARC clients' social security benefits would have been either reduced or terminated had this extra income been reported, the defendants paid the monies intended for these favored clients to third parties. SPARC labeled some of the payments as payments to clients' landlords, although evidence at trial showed that SPARC officials knew that some of the third parties to which the checks were made out were not the clients' landlords. In other instances, the defendants delivered "expense" checks made payable to third party payees directly to favored clients. By structuring the payments in this manner, the defendants were able to circumvent the social security and tax laws.

Numerous witnesses at trial testified regarding both the over-charging of rent and the payment scheme. One witness who discovered that he was being overcharged for rent confronted Crader, and was told that the excess went for needs of those who were "worse off." Crader suggested to certain employees of SPARC that their salaries would be better paid to a third party so as not to risk a reduction of the employees' social security benefits. Crader asked several of his employees for names of other persons to

---

same double-dipping scheme, or by using the program's funds for unauthorized purposes. These organizations include the following: The Community Housing Resources Board of Lubbock; The Ryan White Assistance Program; Catholic Family Services, Inc.; St. Mary's Hospital; Project HELP.

4

whom he could make out their checks. At least one witness testified that he received a W-2 form including these payments, but that when he complained, Crader said that he would "take care of it," and the witness never saw the form again.

Although much of the trial testimony focused on Crader, as the head of the organization, the record is replete with evidence of Eckert's involvement in the scheme. Although Echols usually collected the cash rents from all of the clients, Eckert, occasionally assumed these duties. The record also shows that Eckert "cleaned up" the HOPWA files after a HUD audit of SPARC's offices, and falsified some of the records. Finally, twenty-one of the forty-seven third party checks where signed by Eckert. Most were signed by Crader as well, but four were executed by Eckert alone. The government's case included testimony that Eckert was extremely involved in the day-to-day management of the office, with many responsibilities and a great deal of direct client contact. Eckert was also Crader's life partner, and as such, the two had almost constant contact with each other, both at work and at home.

On the drug counts, appellants' argued that the lengthy waiting periods many AIDS patients were required to endure before receiving government assistance to purchase medication placed the lives of these patients in peril, and that providing these medications immediately saved lives. Essentially, the defendants argued that they were choosing between the "lesser of two evils." The defense requested a jury instruction on necessity directed at this issue, but that request was denied by the trial court.

Crader was indicted on seventy-two counts, and convicted by the jury on all seventy-two. Eckert was charged with seventy-one counts, and again, was convicted on all seventy-one counts. Both defendants now appeal these convictions on the grounds discussed below.

## II.

The defendants argue first that the evidence is legally insufficient to support their convictions on the money laundering counts (Counts 30-37, 39, and 43-76). When reviewing the sufficiency of the evidence, this court views all evidence, whether circumstantial or direct, in the light most favorable to the verdict with all reasonable inferences to be made in support of the jury's verdict. United States v. Salazar, 958 F.2d 1285, 1290-91 (5th Cir. 1992). The evidence is sufficient to support a conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. To obtain a conviction for money laundering, the government must prove that the defendant (1) conducted or attempted to conduct a financial transaction; (2) which the defendant knew involved the proceeds of a specified unlawful activity; (3) with the intent either to promote the specified unlawful activity (the "promotion prong"), or to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity (the "concealment prong"), or to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code (the "tax avoidance prong"). 18 U.S.C. § 1956; *see* United States v.

6

Wyly, 193 F.3d 289, 295 (5th Cir. 1999). All forty-two money laundering counts charged the defendants with violating the tax avoidance and concealment prongs of the statute. Counts 65 through 76 also charged the defendants with violating the promotion prong.

Specifically, the defendants allege that the government's proof on these counts fails in three distinct areas:

A.   The money laundering counts are merged into the counts charging mail fraud and false statements because the unlawful activity underlying these counts is the same activity that comprises the factual basis for the financial transactions under the money laundering offenses;

B.   The government's theory of the case is that the defendants were concealing income to avoid the loss of Social Security benefits for the agency's clients. The government's evidence, which proceeded under this theory, fails to establish an intention to violate the income tax laws to meet the tax avoidance prong of the money laundering offense; and

C.   The financial transactions that are the basis of the money laundering counts are innocent spending of proceeds, not illegal money laundering.

A.

On the defendants' first point, they argue that because "specified unlawful activity" relied on by the government under the money laundering statute was the same activity the government relied on to establish the statute's "financial transaction," the

7

government failed to prove these two independent statutory elements. The defendants obviously misapprehend the government's case. Each money laundering count in the indictment alleges that the defendants obtained the proceeds by means of the mail fraud scheme outlined in Counts two through nine (the specified unlawful activity). To establish this element, the government produced proof that SPARC fraudulently charged clients for rent, utilities and other services, while at the same time sought and collected reimbursement for those charges from federal and private grants. To establish the additional element, the government produced evidence that the defendants then engaged in separate financial transactions by disbursing those fraudulently obtained funds to favored SPARC clients via "rent" or "expense" checks made out to third parties. Because the charged "specified unlawful activity" is independent from the charged "financial transactions," the defendants' merger argument fails.

## B.

The defendants argue next that the conduct alleged does not satisfy the tax avoidance prong of the money laundering statute because they had no intent to evade the income tax laws. Rather, the third party payments were structured for the purpose of preventing the true recipients of the payments from losing their Social Security disability benefits. The tax avoidance prong of the money laundering statute prohibits financial transactions made with the proceeds of an unlawful activity with the "intent to engage in conduct constituting a violation of Sec. 7201 or 7206 of

8

the Internal Revenue Code of 1986." 18 U.S.C. § 1956 (a)(1)(A)(ii). Section 7201 of the Internal Revenue Code prohibits the evasion of income taxes. Section 7206 prohibits willfully aiding, assisting or counseling the preparation of any document which is false or fraudulent and which relates to a matter arising under the internal revenue laws.

The government produced sufficient evidence to establish that the defendants intended to violate both Sections 7201 and 7206. The defendants aided the ultimate beneficiaries of the third party checks in evading income taxes by issuing the checks in a third party's name, rather than in the name of the actual recipient, and by characterizing the payments as rent or reimbursements, rather than as salary or other income. SPARC's accountants counseled the defendants not to engage in these practices. The defendants also failed to issue 1099's or W-2's to the ultimate beneficiaries of the checks, which allowed them to evade income taxes due on those funds. In addition, the defendants' actions clearly violated Section 7206. Following the issuance of the third party checks, the defendants directed the preparation of Forms 1099 and W-2 which reported taxable income under the names and tax identification numbers of the third party recipients rather than the actual recipients of the funds. These documents were false as to a material matter in connection with the internal revenue laws. The record shows that the defendants' accountants also repeatedly counseled against these practices. Clearly the evidence of a violation of the tax avoidance prong of the money laundering

9

statute was factually and legally sufficient.

C.

The defendants' final sufficiency argument is that the financial transactions that are the basis of the money laundering counts were consistent with legal, legitimate activities and based on attorney/accountant advice; accordingly, they do not satisfy the promotion prong of the money laundering statute. This argument also fails. The advice of counsel defense was presented to the jury by testimony of Crader and SPARC employee Strange that they had been advised that the third party payments they were making were legitimate. By finding the defendants guilty on all counts, the jury obviously rejected this testimony, which is not surprising in light of conflicting testimony by SPARC's accountants that they counseled defendants not to engage in these practices, and direct evidence that the defendants acted deliberately to conceal the true recipients of the payments.

Only counts sixty to seventy-six allege a violation of the promotion prong of the money laundering statute. Those counts are based on payments made to co-defendant Echols which were disguised as payments to Mack Durran. We need not consider whether those payments satisfy the promotion prong of the money laundering statute. Those counts also alleged violations under the concealment prong and tax avoidance prong. The tax avoidance prong was discussed previously. By establishing that the defendants used fictitious payees and disguised the nature of the many payments as reimbursements, the government also proved that the

10

financial transactions were designed to conceal or disguise the nature, ownership, or control of the proceeds of unlawful activity, thus satisfying the concealment prong of the statute.

## III.

Eckert also challenges his money laundering convictions on grounds that the evidence failed to establish a knowing or intentional violation on his part. He argues that the evidence is insufficient to show his knowledge under all three prongs of the money laundering statute (*i.e.*, the concealment, promotion, and tax evasion prongs discussed above).

After reviewing the record, we are convinced that the evidence is sufficient to show that Eckert possessed the required mental state to satisfy all three varieties of money laundering charged. As discussed above, the evidence showed that Eckert was the number two man at SPARC and also Crader's life partner. Eckert occasionally collected the illegal cash rents personally, "cleaned up" files in the office after federal agency inspections, and signed twenty-one of forty-seven third party checks, four without Crader's signature. It was certainly reasonable for the jury to infer from these and other facts presented at trial that Eckert knew of the "double-dipping" scheme and knew exactly why the third party checks were being issued, and knew that the use of this payment method would result in tax fraud. The jury was therefore reasonable in finding that Eckert was guilty of all three types of money laundering charged, and we will not disturb its verdict.

## IV.

11

Defendants next argue that the district court erred in refusing to instruct the jury on the defense of necessity as to the controlled substance violations. We review the district court's failure to submit the requested instruction for abuse of discretion. United States v. Posado-Rios, 158 F.3d 832, 875 (5th Cir. 1998).

To raise the defense of necessity, the defense must present evidence from which a reasonable jury could infer each of the following:

> (1) That defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;
>
> (2) That defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct;
>
> (3) That defendant had no reasonable, legal alternative to violating the law...; and
>
> (4) That a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm.

United States v. Gant, 691 F.2d 1159, 1162-63 (5th Cir. 1982).

A.

Because the defendants failed to submit evidence from which the jury could have found the required elements of this defense, the district court did not abuse its discretion in refusing to submit the requested instruction.

First, the defendants failed to identify a single situation in which their clients were faced with an "imminent threat...of death or serious bodily injury," which is required to establish the

12

defense of necessity. Although many SPARC patients ultimately died as a result of complications arising from the AIDS virus, the defendants could not pinpoint any particular episode in which one of their clients was faced with an emergency condition that might be alleviated through the use of the stockpiled medication. To the contrary, the medical testimony at trial showed that "there is rarely, if ever, an emergency to treating HIV/AIDS" and that "the fact that there was a waiting period for [AZT] did not endanger people's health."[2]  Additionally, the evidence adduced at trial confirmed that some of the medications defendants dispensed merely eased pain or alleviated annoying, though not life-threatening symptoms of the AIDS virus.

Second, the defendants' evidence did not show that they had no alternative but to stockpile and dispense the drugs.  Although there was a waiting period to obtain free prescriptions for many of the drugs that defendants distributed, the defendants never established why they could not have taken gravely ill patients to the hospital, or used SPARC monies to purchase the needed medications. Additionally, the record showed that numerous federal and state programs assist HIV/AIDS patients in obtaining medication, sometimes in as little as two weeks, and pharmacies sometimes assist patients by filling their prescriptions on credit and waiting until a later date for payment.  The defendants must show that they actually tried the alternative, had no time to try

---

[2]R. at 6-1296; R. at 3-533-34.

it, or that a history of futile attempts revealed the illusionary benefit of the alternative. Gant, 691 F.2d at 1164. They made no such showing.

Finally, the defendants failed to produce adequate evidence of a direct causal relationship between their distribution of stockpiled medication and the avoidance of a threatened harm. As discussed above, no specific instance was identified in which the defendants' conduct saved a patient from death or great bodily harm. On the contrary, the evidence at trial suggested that distribution of medication in this manner could actually cause greater harm, in the form of mutations in the AIDS virus due to decreased potency of expired antibiotics and potentially fatal heart attacks due to decreased potency of expired nitroglycerin.

B.

The district court was also correct in refusing to charge the jury on necessity because the defendants failed to submit a jury instruction that was "substantially correct."[3] Defendants' proposed instruction read as follows:

> In order to excuse an act that would otherwise be criminal, however, the defendants must, by a preponderance of the evidence, show the following:
>
> (1) That the defendants were faced with a choice of evils

---

[3]This Court has developed a three-part test to determine whether a jury instruction should be submitted: "(1) The instruction is substantially correct; (2) The requested issue is not substantially covered in the charge actually given to the jury; and (3) The instruction concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a defense." United States v. Correa-Ventura, 6 F.3d 1070, 1076 (5th Cir. 1993).

14

and chose the lesser evil;

(2) That the defendants acted to prevent imminent harm;

(3) That the defendants reasonably anticipated a causal relationship between their conduct and the harm to be avoided; and

(4) That there were no other reasonable legal alternatives to violating the law.

The requested instruction misstates the law of necessity in omitting the requirement that they be operating under a "present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of *death or serious bodily injury*." Choosing the "lesser of two evils" is clearly not the equivalent, nor is acting to prevent "imminent harm." Because the requested instruction was not substantially correct, the district court did not err in refusing to submit it to the jury.

V.

Finally, the defendants argue that the district court erred in admitting SPARC American Express billing statements into evidence. The government offered these records in an attempt to account for the use of the illegally collected funds and to rebut defense counsel's opening statement that the defendants did not personally benefit from these transactions. Many of the purchases made by defendants on the account are obviously for their personal use.[4] Certainly, then, the government wanted these records in evidence to

---

[4]For example, the defendants purchased items such as clothing, art supplies, and tanning products.

15

provide the jury with a basis to infer that the defendants personally benefitted from their scheme.

The defendants argue that these records should have been excluded under Federal Rules of Evidence 401 (relevance) and 403 (probative value outweighed by unfair prejudice). We review the district court's admission of the records for abuse of discretion. United States v. Pena, 949 F.2d 751, 757 (5th Cir. 1991).

Although the defendants objected to the admission of the records on the grounds that the government failed to lay the proper foundation for the introduction of the documents as business records, they failed to object to the admission of the American Express statements on either 401 or 403 grounds.[5] We therefore review the admission of the records for plain error. United States v. Hernandez-Guevara, 162 F.3d 863, 873 (5th Cir. 1998).

---

[5]The defendants did object on 403 grounds to an earlier introduction of summaries of these billing statements. These summaries explained the charges made on the account and the payments made against that account. The payments made were tracked by their source - *e.g.*, those funds that came from SPARC to pay off a portion of the American Express account were labeled "SPARC" and those coming from Crader himself were labeled as such. However, the government was unable to determine the source of the funds used to pay approximately $38,000 in receipts. The government therefore labeled the source of these funds as "unknown." The defendants objected to the use of the term "unknown" as unfairly prejudicial. The trial court admitted the summaries over defense objection.

When the American Express records themselves were introduced, defendants objected, as discussed above, on grounds that the government did not lay a proper foundation to meet the business records exception and "also for the reasons previously stated in our motion outside the presence of the jury." However, since the previous objection was only to the use of the term "unknown" on the billing summaries, this objection was certainly not sufficient to preserve error as to the entire American Express statements on 401 and 403 grounds.

16

Before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, (3) that affects substantial rights, and (4) seriously affects the fairness, integrity or public reputation of judicial proceedings. <u>United States v. Olano</u>, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776 (1993). The defendants have not demonstrated to us that the admission of the records here meets any of the four prongs of this test. Even if there were error, which is doubtful, there was no plain error, and the district judge did not abuse his discretion in admitting the American Express records into evidence.

VI.

For the foregoing reasons, we AFFIRM the judgment of the district court.

17