[Cite as *State v. Roller*, 2016-Ohio-8554.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 15 MA 0164 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| RICHARD ROLLER, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of
Common Pleas of Mahoning County,
Ohio
Case No. 12CR1144

JUDGMENT: Affirmed and Remanded.

APPEARANCES:

For Plaintiff-Appellee: Atty. Micah Ault
Assistant Attorney General
615 W. Superior Ave., 11th Floor
Cleveland, Ohio 44113

For Defendant-Appellant: Atty. John Yuhasz
7081 West Boulevard, Suite 4
Youngstown, Ohio 44512

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: December 30, 2016

ROBB, J.

**{¶1}** Defendant-Appellant Richard Roller appeals his convictions entered in Mahoning County Common Pleas Court for theft in office and grand theft with enhancements. The first issue raised in this appeal is whether the trial court improperly instructed the jury that MYCAP was a public organization. The second issue is whether there was sufficient evidence to convict Appellant of theft in office and grand theft. The third issue is whether the trial court erred when it sua sponte instructed on the affirmative defense of entrapment by estoppel. The final issue is whether there was misconduct by the prosecutor and, if so, did that conduct effect the trial to the point it was unfair.

**{¶2}** For the reasons expressed below, the first, second, and fourth assignments of error lack merit. The third assignment of error has merit; however, the error committed was harmless. Accordingly, Appellant's convictions for theft in office and grand theft are affirmed. Although, the convictions are affirmed, we sua sponte remand the matter to the trial court to correct a mistake in its final judgment entry. In the entry the court indicated Appellant was found guilty of having an unlawful interest in a public contract, a fourth degree felony. 8/20/15 J.E. That statement is incorrect. The jury found him not guilty of that charge. The judgment entry must be corrected.

## Statement of the Facts and Case

**{¶3}** Appellant began working for Youngstown Area Community Action Council in the early 1990s. After years of service he became the executive director. At some point during his service Youngstown Area Community Action Council became Mahoning Youngstown Community Action Partnership (MYCAP). MYCAP is a private nonprofit corporation. Roller stated MYCAP's mission was to empower low-income and/or working families in the Mahoning County/Youngstown area. Tr. 482.

**{¶4}** In 2008, while Appellant was the executive director, MYCAP obtained a grant through the Ohio Department of Job and Family Services which was overseen and administered by the Governor's Office of Faith Based Initiatives. Appellant signed the grant on behalf of MYCAP. This grant allowed MYCAP to hire consultants

to perform training sessions and "technical assistance" sessions in a 22 county area, a larger than normal jurisdiction for MYCAP. In addition to the larger geographical area, this grant was not limited to low-income persons. Tr. 488.

{¶5} Under this grant Roller and three other MYCAP employees provided training services. In providing the services, Roller and the employees used paid time off (PTO) from MYCAP. Thus, they were paid by MYCAP and were paid under the grant. The language of the grant specifically prohibited persons from acting as consultants while drawing compensation from any other federally or state-funded program.

{¶6} Appellant acted as a consultant for the "technical assistance" sessions charging $1,000 for each session. He received a total of $14,000 for these sessions and also collected his MYCAP salary.

{¶7} Sometime thereafter MYCAP was audited by multiple state agencies. The state questioned the amounts paid to the MYCAP employees, including Appellant. The state also questioned charges for equipment used during the sessions.

{¶8} During the audit it was also discovered that during Appellant's tenure as executive director, a contract between Chef's House and MYCAP was entered into whereby Chef's House provided food service to MYCAP/Head Start. Chef's House was owned and operated by Jason Roller, Appellant's brother. MYCAP had a Code of Ethics permitting family members to be hired as long as the family members did not live with each other; however, that policy was in violation of federal law. Tr. 352.

{¶9} As a result of the audit, a four count indictment was issued against Appellant. He was charged with theft in office in violation of R.C. 2921.41(A)(1), a third-degree felony; grand theft in violation of R.C. 2913.02(A)(3), a fourth-degree felony; unlawful interest in a public contract in violation of R.C. 2921.42(A)(1), a fourth degree felony; and soliciting or receiving improper compensation in violation of R.C. 2921.43(A)(1), a first-degree misdemeanor. 10/25/12 Indictment. The first two counts, theft in office and grand theft, had enhancement specifications indicating the amount taken was $7,500.00 or more.

{¶10} As the case proceeded to trial, Appellant filed a motion in limine to preclude the state from arguing and the trial court from instructing on the affirmative defense of entrapment by estoppel. 2/26/15 Motion. Appellant claimed he was not asserting the affirmative defense, but rather arguing the elements of the offense could not be established.

{¶11} The jury trial began on May 11, 2015. Following the state's case in chief, Appellant moved to dismiss count four of the indictment, soliciting or receiving improper compensation, because the statute of limitations had run. The state conceded, and count four was dismissed. Tr. 474.

{¶12} Appellant also moved for a Crim.R. 29 judgment of acquittal on the first and second counts of the indictment. Tr. 467. He argued the state failed to offer evidence from which a reasonable jury could conclude there was intent to deprive the owner. Tr. 467. He also argued the state did not offer evidence he was a public officer as required by count one. Tr. 467. The trial court overruled the Crim.R. 29 motion. Tr. 474.

{¶13} Appellant then testified on his own behalf. Following the presentation of Appellant's case, he renewed his Crim.R. 29 motion, argued the jury instruction should not contain a statement that MYCAP was a public agency, and argued the jury should not be instructed on the affirmative defense of entrapment by estoppel. As to MYCAP's status as a public agency, he argued the issue was a jury question. As to the affirmative defense, he asserted it was not his position there was active misleading by the government and/or assurances by the government that what he was doing was legal. Rather, he argued his position was there was no evidence of purpose to deprive, which were elements of the theft offenses. Tr. 542-543.

{¶14} The state asserted it agreed with the trial court's position that MYCAP and its executive director's status was a legal question, not a factual question. Tr. 546.

{¶15} Appellant also filed written objections to the jury instructions on the affirmative defense of entrapment and on MYCAP being a public agency. 5/13/15 Objections.

**{¶16}** The trial court implicitly overruled the objections of Appellant by instructing on the affirmative defense of entrapment by estoppel and instructing the jury that MYCAP was a community agency and public organization. Tr. 625, 630.

**{¶17}** The jury found Appellant guilty of theft in office, grand theft, and both enhancements. The jury found Appellant not guilty of unlawful interest in a public contract. 5/13/15 Jury Verdict Forms.

**{¶18}** Appellant was sentenced to 120 days in jail, 3 years of monitored supervision, and ordered to pay restitution in the amount of $14,000. 8/20/15 J.E. The trial court stayed the 120 day jail sentence pending appeal. 8/20/15 J.E. Appellant appealed his conviction.

**{¶19}** Prior to addressing the assignments of error, there is an error in the trial court's final judgment that must be addressed. The judgment entry reads:

> The Jury Trial commenced on Monday, May 11, 2015 and concluded on Wednesday, May 13, 2015, when the Jury returned a verdict of guilty in Count 1, Theft In Office, a felony of the third degree; Count 2, Grand Theft, a felony of the fourth degree; Count 3, Having An Unlawful Interest In A Public Contract, a felony of the fourth degree as well as enhancements in Counts 1 and 2. Count 4, Soliciting or Receiving Improper Compensation was dismissed by the State of Ohio.

8/20/15 J.E.

**{¶20}** This judgment entry indicates Appellant was found guilty of Count 3. However, the jury found him not guilty of having an unlawful interest in a public contract. This error must be corrected.

<u>First Assignment of Error</u>

"The trial court erred and denied Appellant his rights to trial by jury and due process when it relieved the state of the obligation to prove all elements of the offenses beyond all reasonable doubt. *See*, U.S. Const., amend VI and XIV; Ohio Const., art. I, §§1, 2, 5, 10, and 16."

**{¶21}** This assignment of error deals with the conviction for theft in office. Appellant was found guilty of R.C. 2921.41(A)(1), which provides:

(A) No public official or party official shall commit any theft offense, as defined in division (K) of section 2913.01 of the Revised Code, when either of the following applies:

(1) The offender uses the offender's office in aid of committing the offense or permits or assents to its use in aid of committing the offense.

R.C. 2921.41(A)(1).

When instructing the jury on this offense, the trial court explained:

Regarding Count One, the defendant is charged with theft in office. Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about June 19th, 2009, through on or about July 13th, 2009, in Mahoning County, Ohio, the defendant did, while being a public or a party official, commit a theft offense, when the offender used the offender's office in aid of committing the offense and the value of the property or services stolen was $7,500 or more.

* * *

As a matter of law, ladies and gentlemen, the court instructs you that MYCAP was, in fact, a community agency, and is a public organization.

You must also find that the defendant at the time of the commission of the acts was a public official. And public official means any elected or appointed officer, or employee, or agent of the state or any political subdivision thereof, whether in a temporary or permanent capacity, and including without limitation, legislators, judges, and law enforcement officers.

Tr. 619-620, 625.

{¶22} Appellant finds fault with this instruction for two reasons. First, he contends MYCAP's status as community agency/public organization is a factual issue and an element of the offense. Thus, it was for the jury to determine if MYCAP was a

public agency. His argument stating MYCAP is a public organization indicates Appellant's position as executor director of MYCAP constitutes a public office for purposes of the theft in office statute. Second, he contends the trial court's determination MYCAP is a public organization is incorrect. It is a private nonprofit corporation, and although it receives grants from the state and federal government, it also receives private funds.

{¶23} The first issue is whether MYCAP and its executive director's status is a factual or legal question. The trial court determined it was a legal question for the court to decide. Tr. 267.

{¶24} This conclusion is correct. Questions of statutory interpretation are questions of law. *Riedel v. Consol. Rail Corp.*, 125 Ohio St.3d 358, 2010–Ohio–1926, ¶ 6, 928 N.E.2d 448 (2010). In order to be a public official under R.C. 2921.41(A), Appellant must qualify as a public official as defined by R.C. 2921.01. Division (A) of that section provides:

> "Public official" means any elected or appointed officer, or employee, or agent of the state or any political subdivision, whether in a temporary or permanent capacity, and includes, but is not limited to, legislators, judges, and law enforcement officers. "Public official" does not include an employee, officer, or governor-appointed member of the board of directors of the nonprofit corporation formed under section 187.01 of the Revised Code.

R.C. 2921.01(A).

{¶25} Although it was within the province of the jury to determine whether Appellant was working for MYCAP when the alleged crimes occurred, it was not a jury decision to determine whether MYCAP was a public organization and whether its executive director was a public official. MYCAP and its executive director's status is a legal question because it calls for statutory interpretation of R.C. 2921.01(A).

{¶26} To conclude otherwise would mean two different juries hearing the same information could potentially reach different conclusions about whether MYCAP is a public organization and whether its executive director is a public official. If that

were to happen, then case law would not be cohesive. The determination of whether the executive director of MYCAP or any community action agency is a public official and of whether MYCAP is a public organization are legal questions.

{¶27} Consequently, our analysis continues with the questions of whether MYCAP was a public organization and was its executive director a public official for purposes R.C. 2921.41.

{¶28} At the outset it is noted, although MYCAP no longer uses the term "community action agency" in its title, it is a community action agency. Jeff Bankey, Chief Auditor for the Ohio Development Services Agency, testified MYCAP was a community action agency. Tr. 360. No witness disputed that testimony.

{¶29} The definition of public official in R.C. 2921.01 states an employee, officer, or governor-appointed member of the board of directors of the nonprofit corporation formed under R.C. 187.01 is not a public official. The evidence indicated MYCAP, as a community action agency, was a nonprofit corporation. However, a community action agency's designation is made pursuant to R.C. 122.69, not R.C. 187.01. JobsOhio is governed by R.C. 187.01. Consequently, the executive director of a community action agency does not fall under the expressed exception to a public official enumerated in R.C. 2921.01(A). However, that does not necessarily mean the executive director of a community action agency is a public official.

{¶30} Neither the Ohio Supreme Court nor any of our sister districts have addressed the issue of whether the executive director of a community action agency is a public official for purposes of R.C. Chapter 2921. The only decision directly on point in Ohio is an informal advisory opinion from the Ohio Ethics Commission. Ohio Ethics Commission Informal Advisory Decision dated October 21, 2002.

{¶31} The Ohio Ethics Commission was asked if the board of trustees and executive director of a community action agency created under R.C. 122.68 and 122.69 were subject to the prohibitions imposed by the Ohio Ethics Law and related statutes. *Id.* at pg. 1. In answering the question, the Commission acknowledged a community action agency is a nonprofit corporation. *Id.* It concluded although the board of trustees and executive director are not subject to Ohio Ethics Law prohibitions contained in R.C. Chapter 102, the board of trustees and executive

director are "agents of the state," and thus, "public officials" for purposes of R.C. Chapter 2921. *Id.*

**{¶32}** In reaching its decision, as it pertained to the board of trustees and executive director being agents of the state and public officials for purposes of R.C. Chapter 2921, the Commission explained the definition of the term "public official" includes "agents" of the state. *Id.* at pg. 4. Because "agent" is not defined statutorily, the Commission relied on the definition it used in a previous decision. *Id.*

**{¶33}** In a 1992 opinion concerning the Ohio Grape Industries Committee, the Commission opined:

> A person is an "agent of the state," and thus, a "public official" as defined in Division (A) of Section 2921.01 of the Revised Code, when: (a) the person has the power to act on behalf of and bind the state by his actions; (b) the state has the right to control the actions of the person; and (c) the actions of the person are directed toward the attainment of an objective sought by the state.

Advisory Opinion Number 92-001.

**{¶34}** The Commission determined a member of the Ohio Grape Industries Committee is an agent of the state because the Committee is "funded by the state and has the statutory authority to contract with others for research and market surveys, and to make, 'in the name of the Committee,' contracts to render service in formulating and conducting plans and programs for the promotion of grapes and grape products." *Id.* Also, there is oversight by the Department of Agriculture to ensure the Committee is self-supporting. *Id.* Likewise, statutorily the Committee's actions are to promote the grape industry within the state, which is an objective the state seeks. *Id.*

**{¶35}** In applying a similar rationale, in the 2002 informal advisory opinion the Commission explained a community action agency receives community development block grants (CDBG) from the state through the Office of Community Services (OCS) for attainment of the state's objection to alleviate the causes of poverty in a designated geographical service area. Ohio Ethics Commission Informal Advisory

Decision dated October 21, 2002, pg. 5. The Commission reasoned community action agencies can bind the state and the state controls community action agencies in a number of ways:

> The state, acting through the General Assembly, enacted statutes that specifically empower a designated CAA to act on behalf of and bind the state with regard to its use and distribution of CDBG funds.
>
> The state, through OCS, exercises control over a CAA in several ways. The state has a degree of fiscal oversight and control over a CAA. For example, R.C. 122.69(B)(3) requires that a CAA that receives an OCS designation must limit the number of trustees to not less than fifteen nor more than thirty-three members and must meet specified federally mandated standards. In addition, a CAA is required to annually submit to OCS a program plan and budget for use of CDBG funs. R.C. 122.69(B)(2). After providing notice and hearing pursuant to Chapter R.C. 119., the director of DOD [Department of Development] may rescind the designation of a CAA if he finds that the CAA is not in compliance with any or all of the provisions of R.C. 122.69. R.C. 122.701.(B)(1).

*Id.*

{¶36} The Commission then explained the executive director of a community action agency can act on behalf of and bind the state with regards to the functioning of the community action agency. *Id.* at pg. 6-7.

{¶37} As aforementioned, although MYCAP no longer uses the term "community action agency" in its title, it is a community action agency. MYCAP was pursuing an objective the state sought to achieve - it was providing services to the poor and combating poverty. In pursuing this object, it was receiving grants from the state and the state audited those grants.

{¶38} The Ethics Commission's 2002 informal advisory opinion supports the legal conclusion MYCAP is a public organization/agency and Appellant was a public official as its executive director. However, this is not the only case that supports such

conclusion. There is a common pleas court decision from Lucas County holding a community action agency, specifically the Economic Opportunity Planning Association of Greater Toledo ("EOPA"), is a public office for purposes of the public meetings and the public records act. The reasoning used to reach that conclusion is instructive as to why a community action agency is a public organization/agency and why its board and executive director are public officials; the agency and its executive director can bind the state and the state has a degree of oversight:

> In its capacity as a community action agency, EOPA receives, is accountable for and is charged with spending substantial sums of public funds in the operation of programs for the public welfare. These programs and EOPA's plans for operating them are submitted to and approved by the Governor of Ohio. EOPA must comply with those plans, and with state statutory provisions, or lose its status as a community action agency.
>
> * * *
>
> With these essential principles in mind, there can be no question that EOPA is a public body within the meaning of the Public Meetings Law. EOPA has been designated by the Ohio Department of Development, through its Office of Community Services, as a community action agency within the meaning of R.C. 122.69. To be eligible for this designation, EOPA must obtain the endorsement of officials from at least two thirds of the municipal corporations and counties within the community it serves. R.C. 122.69(A). The Board of Trustees of EOPA must be organized in accordance with the provisions of state statute, and that statute defines the powers and duties that can and must be exercised by the board. R.C. 122.70.
>
> Designation as a community action agency is critical to EOPA because it is an absolute prerequisite to EOPA's ability to receive the governmental funds for the programs that EOPA operates. Once

EOPA qualifies to receive, and actually receives, those funds, their use is a matter of critical importance to the state government. The Governor must certify to the federal government that the funds that are distributed to community action agencies will be used in accordance with the plan the Governor has developed, approved, and submitted to the federal government.

*State, ex rel. Toledo Blade Co. v. Economic Opportunity Planning Assn. of Greater Toledo*, 61 Ohio Misc.2d 631, 640-641, 582 N.E.2d 59 (C.P.1990).

**{¶39}** That said, there are two appellate court cases which one might argue support the conclusion a community action agency is not an agent of the state. They are *State ex rel. Dist. Eight Regional Organizing Commt. v. Cincinnati-Hamilton Cty. Community Action Commt.*, 1st Dist. No. C-100099, 192 Ohio App.3d 553, 2011-Ohio-312, 949 N.E.2d 1022, ¶ 15 and *N.Z. v. Lorain Head Start*, 9th Dist. No. 98CA007254, 2000 WL 59911.

**{¶40}** The First Appellate District case dealt with a public records act request and reached the opposite result reached in *State, ex rel. Toledo Blade Co. State ex rel. Dist. Eight Regional Organizing Commt.*, 2011-Ohio-312. The First Appellate District determined a community action agency was not the functional equivalent of a public office for purposes of the public records act:

Mindful of the presumption that private entities are not subject to the Public Records Act, we conclude that the evidence does not show clearly and convincingly that CAA is the functional equivalent of a public office. Although its designation as a community-action agency was established by the government, and CAA receives a considerable amount of funding from the government, the HWAP [Home Weatherization Assistance Program] program does not carry out a traditional governmental function. Further, the government is not involved in the day-to-day operation of the agency.

*Id.* at ¶ 15.

**{¶41}** The second case is a 2000 decision from the Ninth Appellate District holding Lorain Community Action Agency (LCAA) was not a political subdivision for purposes of R.C. Chapter 2744, the governmental immunity statutes. *N.Z. v. Lorain Head Start*, 9th Dist. No. 98CA007254, 2000 WL 59911. In that case, a child was allegedly the victim of sexual abuse while participating in the Head Start educational program operated by LCAA. *Id.* The appellate court reversed the grant of summary judgment for LCAA reasoning, "a body corporate and politic must be characterized by an agency relationship between a governmental unit and the entity claiming immunity that results in public control of the internal, day-to-day operations of the entity. Private corporations are excluded from the definition of a body corporate and politic." *Id.* (Internal citations omitted.). It then stated:

> These provisions demonstrate that designation as a "community action agency" is a status conferred upon a nonprofit entity that operates in addition to the entity's existence as a nonprofit corporation: designation as a community action agency does not create an organization, and the continuing existence of the nonprofit entity operates independent of that designation. Although this status is conferred by the state, the organizations themselves cannot be said to be creatures of the state as required by R.C. 2744.01(F). See *Weber, supra*.

> LCAA is a nonprofit organization with the additional designation as a community action agency. It is not an agency created by the state and, accordingly, it is not a political subdivision entitled to the benefit of the immunity provided by R.C. 2744.02. The appellant's first assignment of error is well taken.

*Id.*

**{¶42}** In considering all the above cases, the Ethics Commission's 2002 informal advisory opinion is persuasive and instructive because it deals with the specific issue before us. That case cites *State, ex rel. Toledo Blade Co.* in support of the conclusion that MYCAP is an agent of the state. *State, ex rel. Toledo Blade Co.* is not directly on point for the issue decided by the Ethics Commission's informal

advisory opinion; however, it provides reasoning as to why community action agencies are agents of the state. We agree with that reasoning and do not find the First Appellate District's opposite conclusion in *State ex rel. Dist. Eight Regional Organizing Commt.* persuasive. Likewise, the decision in *N.Z.* does not help us resolve the issue before us. We are not addressing whether a community action agency constitutes a political subdivision under the immunity statutes in R.C. Chapter 2744. Rather, we are determining whether a community action agency is an agent of the state for purposes of R.C. Chapter 2921. The Ethics Commission's informal advisory opinion indicated a community action agency may be subject to some statutes, but not to others. For instance, the board of trustees and the executive director are not subject to the Ohio Ethics prohibition in R.C. Chapter 102. Ohio Ethics Commission Informal Advisory Decision dated October 21, 2001, pg. 1. Consequently, *N.Z.* does not provide any guidance on whether a community action agency is an agent of the state for purposes of R.C. Chapter 2921.

{¶43} In conclusion, we agree with the decision in the 2002 Ethics Commission's informal advisory opinion. We conclude MYCAP is an agent of the state and its executive director, by extension, is a public official under R.C. 2921.41. This assignment of error lacks merit.

<u>Second Assignment of Error</u>

"The trial court erred and denied Appellant due process of law when it submitted offenses theft in office, theft and unlawful interest in a public contract for the jury's determination despite the lack of sufficient evidence as to all of the elements."

{¶44} This assignment of error addresses whether there was sufficient evidence to support the theft in office and grand theft convictions.

{¶45} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing Black's Law Dictionary 1433 (6th Ed.1990). In reviewing a sufficiency of the evidence challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the

prosecution, any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979).

{¶46} The sufficiency argument concerning theft in office is the same argument presented by Appellant under the first assignment of error. We found the argument lacked merit. For those same reasons, the argument there is insufficient evidence for the theft in office conviction likewise lacks merit.

{¶47} As to the grand theft conviction, Appellant argues there was no evidence indicating he had purpose to deprive the state of the $14,000 or indicating he acted with deception to obtain control over the currency. He states he did not use a false name; his name was on the application for payment and the state paid the claim.

{¶48} The state asserts Appellant acted with purposes to deprive the state when he submitted invoices for the consulting work he allegedly performed.

{¶49} Appellant was convicted of grand theft in violation of R.C. 2913.02(A)(3), which provides, "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services  * * * [b]y deception." He was also found guilty of the enhancement; the property or services were valued at $7,500 to $150,000. R.C. 2912.02(B)(2).

{¶50} Appellant's argument focuses on three specific elements of grand theft - purpose, deception, and deprive. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). Deception is defined as, "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(A). Deprive

means to "[w]ithhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration." R.C. 2913.01(C)(1).

{¶51} Evidence established Appellant submitted a $14,000 bill for consulting work he allegedly performed. The consulting work was for the grant awarded to MYCAP from the Governor's Office of Faith–Based and Community Initiative. The money was paid to Appellant. Tr. 343-344, 375. At the same time he charged for the consulting work, he received paid time off from MYCAP. Tr. 343-344.

{¶52} The evidence established Appellant was prohibited from acting as a consultant while an employee for MYCAP. John Maynard worked for the Ohio Department of Job and Family Services and was the assistant deputy fiscal director at the time the audits were done on MYCAP. Tr. 391. In reviewing the consultant agreements created pursuant to the grant awarded to MYCAP from the Governor's Office of Faith–Based and Community Initiative, he explained the agreements stated, "The consultant understands that they are not an employee of MYCAP or any faith-based or community organization they will be providing training or technical assistance to." Tr. 309. Maynard explained these agreements were signed by the MYCAP employee and Appellant.

{¶53} Maynard further explained the agreement and federal law prohibit an employee to act as a consultant:

A. In addition to, you know, it sort of describes the scope of work, there's stuff in here that talks about conflicts. So it says, "The consultant shall not solicit, discuss or accept employment or any consulting or other contractual relationship which would directly or indirectly result in personal gain with any MYCAP GOFBCI participating agency." And this one says that they'll comply with -- "They shall notify MYCAP in writing of any offer or proposal which would constitute or have the appearance of constituting a violation of Section II employment."

Q. And so far as this audit then, why were those relevant?

A. Because they are, in fact, employees of MYCAP, and so I know that the federal compliance requirements don't allow an employee to actually act as a consultant. I know that because they were employees and they had taken leave on the days that they went out and they did the training that their leave was, in fact, being allocated to other federal programs. This says, I think in here, that they wouldn't be. It say that under Section 6 for certification, "The consultant certifies upon submission of each invoice not to draw compensation from any other federally or state funded program during the period as they are performing work under this agreement for MYCAP." So I do know that because they claimed leave, it was allocated to the other federal programs that MYCAP was working on .

Q. So they would've been paid twice by tax dollars?

A. Yes.

* * *

Q. On top of that, was it wrong for Mr. Roller to be doubly paid during this time?

* * *

A. Yes. You can only claim a cost to a federal program one time. And so when Mr. Roller charged these technical assistance sessions to the grant, he was paid under the TANF grant, which is 100 percent federal money, so it's 100 percent taxpayer dollars. But then if you put in leave, which it's my understanding he did do, that would've gone into their shared cost pool as administrative cost, and its gets allocated back to the federal grants. So his salary for his leave time would've been charged to other federal grants that the MYCAP organization had.

Tr. 399-400, 453.

{¶54} Jeff Bankey, the chief of auditor of the Ohio Development Services Agency provided similar testimony:

Q. You had testified on direct examination that one of the things that you found at issue was his receiving paid time off, as well as receiving the consultant fee. What's the difference between those two examples?

A. Our issue in this particular instance was not that he was paid from some other – if he was doing a hobby and got paid for it, that's – we don't care about that. It was the fact that he was receiving other funding, I don't recall if it was federal or state, from JFS, and claiming that they were independent contractors doing this, when the law dictates that you can't be both an employee of an organization and an independent contractor that benefits the organization.

Tr. 368.

{¶55} Emily Oquendo, a grant manager at the Ohio Department of Job and Family Services when Appellant's invoice was submitted, was the state employee who approved the invoice for $14,000 to be paid to Appellant. At that time she worked for TANF (Temporary Assistance to Needy Families) and was only handling "the fiscal piece and helped pay their invoices" for the governor's faith-based and community initiative grants. Tr. 371. She testified if she had known Appellant was an employee, then she would not have approved the invoice because "you can't be paid as an employee, and as a contract employee as well." Tr. 378.

{¶56} Also, another witness for the state testified federal circulars are reference manuals and provide guidance to what can or cannot be done. Tr. 222. Appellant admitted to knowing about the circulars. Tr. 505. Specifically, he admitted that A-122 is the federal circular which provided guidance for financial transactions. Tr. 505. He testified he did not believe it was illegal to do consulting as long as certain conditions were met. Tr. 507. Upon reading the circular from the stand, he acknowledged consultants are allowable if they are not employees. Tr. 509.

**{¶57}** Appellant's signature was on the consulting agreements for his MYCAP employees. This shows knowledge of the prohibition of acting as a consultant and being a MYCAP employee. Despite that language he still completed consulting work, charged for that work, and received paid time off.

**{¶58}** Furthermore, there was evidence admitted at trial that the technical assistance consulting fee he should have charged was $100, not $1,000. Tr. 400-402. There was also evidence he may not have performed all of the technical assistance consultations for which he billed. Tr. 412-413.

**{¶59}** Admittedly, the consulting agreement signed by Appellant was not admitted at trial; it does not appear the state could find a copy of it. Appellant asserted his fee structure was different from his employees and he was permitted to charge $1,000. Tr. 501.

**{¶60}** Given all the above evidence and the long established principle that ignorance of the law is no excuse, there was sufficient evidence for the jury to decide the grand theft charge. *See State v. Lovano*, 8th Dist. No. 100578, 2014-Ohio-3418, ¶ 17 (The law does not excuse willful ignorance.) Or in other words, the evidence was sufficient for the jury to infer Appellant acted purposely, with deception, to deprive the state of its money.

**{¶61}** This assignment of error lacks merit.

<u>Third Assignment of Error</u>

"The trial court erred and denied Appellant due process, equal protection, and trial by an impartial jury when it placed the burden of proving an affirmative defense upon Appellant that Appellant did not assert."

**{¶62}** Typically, it is the defendant that requests an instruction on an affirmative defense he or she is asserting. This case does not fall within that typical scenario. In this instance, the state requested an instruction on the affirmative defense of entrapment by estoppel. Appellant orally objected to the request and also filed written objections. Appellant argued he was not raising the defense of entrapment by estoppel, and he did not want the jury instructed on that defense. The trial court, however, granted the state's request and gave an instruction on the affirmative defense of entrapment by estoppel.

{¶63} This scenario raises the question: does a trial court err when it instructs on an affirmative defense over the objection of the defendant? This question is an issue of first impression for our district. Furthermore, we note none of our sister districts or the Ohio Supreme Court have issued a ruling on this question.

{¶64} Therefore, in order to support its position that an affirmative defense instruction can be given where appropriate, even over the objection of the defendant, the state references a Federal Fifth Circuit case, *United States v. Wyly*, 193 F.3d 289 (5th Cir.1999). In that case, the appellate court indicated it could not find any authority approving the giving of an instruction on an affirmative defense when it is not raised by the defense. *Id.* at 301. Given the facts of that case, however, the appellate court concluded the evidence did not support an instruction on the affirmative defense of duress. *Id.* The court concluded, "it was error for the court to instruct the jury on that defense, especially in view of the fact that, not only did Appellants *not* request the instruction, *they objected to it." Id.* (Emphasis in original). The error, however, was deemed to be harmless because viewing the instructions as a whole it was clear the jury was not misled or confused. *Id.*

{¶65} The Fifth Circuit Court of Appeals is not the only court to address the issue. The Court of Appeals of New York has held it is reversible error to instruct on an affirmative defense when defendant has not requested and has objected to such instruction. *People v. Bradley*, 88 N.Y.2d 901, 902, 669 N.E.2d 815, 816 (1996). In quoting one of its prior decisions, the court stated, "As we held in *People v. DeGina*, 72 N.Y.2d 768, 776, 537 N.Y.S.2d 8, 533 N.E.2d 1037, 'a defendant * * * has the right to chart his own defense.' That right is infringed when an affirmative defense is submitted over defense objection and the defendant is thereby prejudiced (*id.*, at 776–777, 537 N.Y.S.2d 8, 533 N.E.2d 1037)." *Id.* The Court further reasoned:

> Moreover, when the defensive theory that the court interjects constitutes an affirmative defense there is an increased danger of prejudice because of the resulting shift in the burden of proof from the prosecution to the defense and the attendant risk that the jury will believe that the defendant has assumed a burden beyond the defense.

> Although defendant was entitled to present inconsistent defenses the risk attendant upon such a choice should not have been foisted on him against his will. The imposition of an affirmative burden of proof over defense objection and the involuntary undermining of the defendant's chosen defense strategy resulted in serious prejudice that requires reversal in this case.

Internal citations omitted. *Id.* at 903-904.

**{¶66}** The New York case is instructive; it highlights the problems with instructing on an affirmative defense over a defendant's objection. Imposing an affirmative defense upon a defendant shifts the burden to the defendant to prove the defense by a preponderance of the evidence. If there is no affirmative defense asserted, then the defense has no burden. Instead a defendant can defend the action by indicating the state failed to prove the elements of the offense beyond a reasonable doubt. It is the defendant's right to choose his trial strategy including an affirmative defense, to defend the action indicating the elements of the offense were not proven beyond a reasonable doubt, or to assert both.

**{¶67}** Given the above, this court concludes the instruction on the affirmative defense over Appellant's objection constituted error. It is better practice for a trial court to not instruct on an affirmative defense when the defendant objects to such instruction. However, as is explained below, the error is harmless in this instance and thus, does not provide a basis for reversal because Appellant was not prejudiced by the error.

**{¶68}** Recently, the Twelfth Appellate District has succinctly explained the defense of entrapment by estoppel:

> "Entrapment by estoppel, grounded in the Due Process Clause of the Fifth Amendment, is a defense that is rarely available. In essence, it applies when, acting with actual or apparent authority, a government official affirmatively assures the defendant that certain conduct is legal and the defendant reasonably believes that official." *Howell* at *11, citing *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir.1994).

Although there are various definitions for the entrapment by estoppel defense:

> [t]he common thread in the caselaw applying the defense is an affirmative misrepresentation of the law by a government official, reasonable reliance, and action upon that misrepresentation by a defendant. When the defense is applicable, it prevents the government from punishing one who reasonably followed the misstatement of one of [the government's] own officials. To allow such punishment would be to sanction the most indefensible sort of entrapment by the State-convicting a citizen for exercising a privilege which the State clearly had told him was available to him.

> *Id.* As a result, the "entrapment by estoppel" defense is only available in instances where (1) a government official announced that the charged criminal act was legal, (2) the defendant relied on that statement, (3) the defendant's reliance was reasonable, and (4) given the defendant's reliance, prosecution would be unfair. *United States v. Levin*, 973 F.2d 463, 468 (6th Cir.1992).

*State v. Shafei*, 12th Dist. No. CA2013-11-196, 2015-Ohio-645, 27 N.E.3d 593, ¶ 22.

**{¶69}** In this instance, there was a basis for the instruction on Count 3, unlawful interest in a public contract. While Appellant was executive director of MYCAP his brother, Jason Roller, was contracted to do food service operation for MYCAP/Head Start. This is the basis for the alleged unlawful interest in a public contract.

**{¶70}** Testimony at trial established Jason Roller was a chef, owned a business called Chef's House, and previously worked for MYCAP. Tr. 117, 119. Testimony from Lois Clark, who was at the time of the incidents Head Start Director, established that it was not Appellant's decision to bring back Jason Roller for food

service operation. Tr. 106. In fact, she testified she is the one who suggested it. Tr. 106. Appellant confirmed the testimony. Tr. 497. He further explained that while bringing Jason back did not violate MYCAP's nepotism policy, it did bring up an issue with the conflict of interest policy. Tr. 498. He explained it created an appearance of impropriety. Tr. 498. He testified he spoke to MYCAP board of director's legal counsel about the issue. Tr. 498-499. Appellant was advised to take the matter to the board, which he did. Tr. 489-500. Appellant testified he was not involved in the board's decision to hire Jason. Tr. 498-500. Admittedly, Appellant signed the contract with Jason, but the board gave him the authorization to do so. Tr. 511.

{¶71} "In reviewing a record to ascertain whether sufficient evidence exists to support the giving of an instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 124, 679 N.E.2d 1099 (1997). The evidence was sufficient to instruct on the estoppel defense as to the unlawful interest in a public contract charge.

{¶72} Furthermore, it appears the jury believed this testimony. Despite the fact Appellant signed the contract on behalf of MYCAP with his brother, the jury found him not guilty of the charge, presumably because the evidence showed the board of directors decided to award Jason Roller the contract, not Appellant.

{¶73} That said, it is acknowledged the entrapment by estoppel defense instruction was not specified to apply only to count three. Tr. 633. The evidence submitted at trial did not indicate Appellant was told by the board or its legal counsel that it was permissible for him to charge $1,000 for a technical assistance consulting session or it was permissible for him to get paid for time off while collecting technical assistance consulting fees. Rather, Appellant argued the grant allowed him to charge $1,000 and he did not purposely deceptively deprive the state of its property. His argument went to whether the elements of the offenses of theft in office and grand theft were proven beyond a reasonable doubt. Thus, an instruction on the affirmative defense of entrapment by estoppel was not warranted on the theft charges.

**{¶74}** Appellant, however, was not prejudiced by the affirmative defense instruction or the trial court's failure to expressly instruct that the affirmative defense was potentially only applicable to count 3. In Ohio, generally, a trial court has broad discretion in fashioning jury instructions. In examining alleged errors in a jury instruction, a reviewing court must consider the jury charge as a whole and "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 135 quoting *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93, 652 N.E.2d 671 (1995).

**{¶75}** Considering the jury instruction as a whole, the instruction clearly indicated the jury had to find all elements of the offenses proven beyond a reasonable doubt in order to find Appellant guilty. The instruction highlighted the requirement that all elements must be found beyond a reasonable doubt even if the jury found the affirmative defense was not proven by a preponderance of the evidence:

> Now, ladies and gentlemen, the defendant has a right to interpose a defense. And the defendant has interposed a defense of what we call entrapment. And the definition of entrapment is that a criminal defendant may assert an entrapment by estoppel defense when the government affirmatively assures him that certain conduct is lawful, the defendant thereafter engages in the conduct in reasonable reliance on those assurances, and a criminal prosecution based upon the conduct ensues. To make out the affirmative defense, the defendant must show that there were affirmative assurances made to him by the government that this conduct was legal. In order to establish an entrapment by estoppel defense, the defendant must prove three elements: One, that there was an active misleading by a government agent; two, that the defendant actually relied on the agent's misrepresentation, which was reasonable in light of the position of the agent, the point of law was misrepresented, and the substance of the misrepresentation; and three,

that the government agent is one who is responsible for interpreting, administering, or enforcing the law defining the offense.

Now, ladies and gentlemen, I explained to you several times that the state has to obligation of proving each and every element of the offense or offenses charged beyond a reasonable doubt. Beyond a reasonable doubt is the highest standard that we have in a criminal case. The defendant, however, is not responsible to prove his defense beyond a reasonable doubt. He is only responsible to prove his defense by a preponderance of the evidence. * * *

So the definition of preponderance of the evidence that you must apply to the defendant's claim is that preponderance of the evidence is the greater weight of the evidence. That is, evidence that you believe because it outweighs or overbalances in our mind the evidence that is opposed to it. A preponderance means evidence that is more probable, more persuasive, or of greater probative value. You must weigh the quality of the evidence. Quality may or may not be identical with quantity.

* * *

If the defendant fails to establish the defense of entrapment by estoppel, the state must still prove to you, beyond a reasonable doubt each and every element of the offense or offenses charged in the indictment before you're justified in convicting the defendant.

If you find the defendant has proven by a preponderance of the evidence the defense of entrapment, you must still find that the State of Ohio, as I've said, has proven each and every element of the offense charged in Counts One, Two and Three.

* * *

If you do not find that the defendant proved by a preponderance of the evidence the defense of entrapment, if you find that the state failed to prove beyond a reasonable doubt any one of the essential elements of the offense, offenses charged in Counts One, Two and Three, you must find the defendant not guilty.

Tr. 630-634.

{¶76} Consequently, this assignment of error lacks merit because although the trial court erred in giving the affirmative defense instruction over Appellant's objection, the error was harmless.

## Fourth Assignment of Error

"Appellant was denied due process, equal protection, and a fair trial when the trial was infected by prosecutorial misconduct."

{¶77} The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. *State v. Fears*, 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (1999). In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[T]he touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 121.

{¶78} There are two instances of alleged prosecutor misconduct. The first is the prosecutor's suggestion and argument Appellant was guilty based on the board's assessment of the evidence. He directs this court to the testimony of Lois Clark when she was asked if the contract between Appellant and his brother was against the law. Tr. 158. Appellant objected to the question and the objection was

sustained. Tr. 158. He also directs our attention to the state's cross-examination of Appellant. The questions asked if the board of directors' decision was law and if the board found what he did to be illegal. Tr. 513-517. Appellant also objected to this line of questioning.

{¶79} In reviewing the cross-examination in its context, the state's questioning focused on two points. First, the questions concerning if the board's decisions were law went to the state's position that Appellant was asserting the affirmative defense of entrapment by estoppel. In context, the questions were not used to assert the board found what he did to be illegal, so it must be illegal. Rather, the questions were a means for the state to attempt to show the affirmative defense was not proven.

{¶80} Thus, in this context it does not appear the prosecutor committed misconduct. However, even if the questions were questionable, they did not affect the outcome of the trial. Many witnesses who were knowledgeable on whether an employee could receive their salary from MYCAP at the same time as receiving grant money for consulting fees testified it was not proper and not allowable by the language of the grant. Tr. 368, 378, 399-400, 453. Furthermore, the language of the grant contracts for three MYCAP employees stated an employee could not be a consultant. Tr. 399-400; State's Exhibits 19-21. Thus, there was sufficient evidence to show theft.

{¶81} The second alleged misconduct occurred during the state's cross-examination of Appellant. The questioning concerned emails to Appellant from the board of director's legal counsel. Tr. 518. Appellant was asked if he had emails advising him if it was okay to enter a contract with his brother. Tr. 518. He responded he did and they were with the board's legal counsel. Tr. 518.

Q. So Mr. Roller, you're telling us that you're on trial for entering an illegal contract with your brother, and you have an E-mail that says it's okay, but you didn't bring a copy of that with you here?

**Mr. Juhasz** [counsel for Appellant]: Objection.

**The Court**:  Overruled.

A.  MYCAP took away my access to my E-mail.

Q.  But you just testified that Percy Squire [prior board counsel] still has a copy of this E-mail?

A.  That he does.

Q.  And Mr. Roller, this – these actions happened back in 2009; is that correct?

A.  Yes.

Q.  And so from that time until today, you were not able to obtain a copy of that E-mail?

**Mr. Juhasz**:  Objection.

**The Court**:  Overruled.

A.  No.

Tr.  519-520.

{¶82}  As previously stated, the state requested, over Appellant's objection, an instruction on the affirmative defense of entrapment by estoppel.  The trial court granted the request.  Appellant bore the burden of proof for the affirmative defense.  Thus, questioning Appellant on the documentation to support his claim that the board approved the contract with Jason was permissible.  Regardless, Appellant was not prejudiced by the questions.  He was found not guilty of an unlawful interest in a contract.  Therefore, the alleged misconduct did not prejudicially affect him.

{¶83}  For the above stated reasons, this assignment of error lacks merit.

Conclusion

**{¶84}** The first, second, and fourth assignments of error lack merit. The third assignment of error has merit. However, the error committed was harmless. Accordingly, Appellant's convictions for theft in office and grand theft are affirmed. Although, the convictions are affirmed, we sua sponte remand the matter to the trial court to correct a mistake in its final judgment entry. In the entry the court indicated Appellant was found guilty of having an unlawful interest in a public contract, a fourth degree felony. 8/20/15 J.E. That statement is incorrect. The jury found him not guilty of that charge. The trial court is instructed to correct the judgment entry.

Donofrio, P.J., concurs.

DeGenaro, J., concurs.